## FRANKLIN *v.* FRANKLIN

[No. 332, September Term, 1969.]

*Decided May 5, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Emanuel Klawans* and *Noah A. Hillman* for appellant.

*George B. Woelfel, Jr.,* for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

Little will be gained by recounting the trivia attending this domestic brouhaha. We shall affirm the decision of the trial judge, Melvin, J., and in so doing we shall draw generously upon his version of what happened.

The appellant (Regina) is 43; the appellee (Kenneth) is 52. They were married in 1946. The elder son, Kenneth, Jr. (Junior), is 21. The younger son, Richard, is 12. On 4 April 1968 Regina filed her bill for a divorce a mensa and the usual ancillary relief. Kenneth's cross-bill for a divorce a mensa was docketed not long thereafter. The case came on for trial on 2 January 1969. Two full days were required to produce the 250 pages of testimony. In the words (slightly edited) of Judge Melvin:

> "Regina left the marital home in March, 1968. (She says March 19th and Kenneth says March 5th.) I find that when she left she did so deliberately and with the intention on her part that the marriage relation would no longer exist. The principal question in the case is whether she was legally justified in leaving. She says she was so justified. It is significant that she did *not* al-

lege in her bill of complaint that the separation was mutually voluntary.

"Regina's chief complaint and the reason given by her for leaving was the conduct of Junior and the failure of Kenneth to remove him from the home. There is little doubt that the boy left much to be desired in his conduct, both in and outside the home. Nor is there any doubt that his attitude towards his mother and his treatment of her were for the most part reprehensible. Apparently, ever since he was sixteen years old he showed little respect or devotion towards her. She admits, however, that Kenneth 'would try to reason with him' and 'tried to straighten him out,' sometimes even by 'fighting him.' According to Kenneth, the ill-feeling between Regina and Junior was mutual and, on her part, she 'showed no love' for her son, 'cursed him,' and in general 'treated him like a dog.' He says he tried to reason with her about the way she treated the boy but 'never got a civil answer from her.' In spite of this he told Junior that she was 'still his mother and [that he] must show her respect' and reprimanded him for his conduct towards her. As noted above his efforts in this regard were admitted by Regina.

"The situation with the son, and the fact that for other reasons the parties were not getting along too well with each other, resulted in a visit together to an attorney's office. This visit took place approximately one month before Regina finally left. At this meeting a separation was discussed. She said she wanted Junior out. According to her Kenneth told the attorney he wanted her out and she could have the furniture. He denies making such a statement, saying a 'lot of things' were discussed 'but nothing materialized.' In any event, they agreed to try to make a go of their marriage 'for a while' longer. But

approximately one month later Regina left, taking the furniture with her. There is no evidence that, *at the time she left,* Kenneth was aware that she was leaving, by agreement or otherwise. Nor is there evidence of any mistreatment of her by either the son or husband during that interim.

"No doubt the relationship between Regina and Junior resulted in much unpleasantness for her. But the responsibility for this unpleasant relationship can not be placed entirely on Kenneth, nor indeed entirely upon Junior—although Junior's general conduct is certainly not to be condoned. As the parties themselves recognized when they entered into a reconciliation agreement in 1963, their responsibility as parents is a 'joint responsibility.' Kenneth's attempts to 'straighten out' Junior have already been mentioned. Admittedly it is the father's lot to discipline an unruly son, but the mother can be helpful also, and there is no evidence in the case of any efforts or suggestions on Regina's part to deal constructively with the situation. Her only solution to the problem was to get Kenneth to put Junior out of the house. I do not find that Junior's conduct toward her was such as to pose a serious threat to her personal safety, and there is no evidence corroborating her testimony that he has ever inflicted any physical injury upon her."

\* \* \*

"Regina further contends that even though her leaving may have been without legal justification, Kenneth has acquiesced in the separation and therefore he should be denied a divorce. In short, she claims that Kenneth's conduct after the separation evidences a willingness on his part that the separation continue. The evidence claimed to support this is the testimony of Re-

gina that on two occasions, once through counsel and once by telephone to his place of employment, she offered to get together with him to discuss their differences, but he refused. Kenneth admits these overtures to 'settle their differences' and that he told her they came 'a little too late.' He said they were made in December, 1968. It will be noted that this was approximately nine (9) months after the separation and [that they] came at a time when the case had already been twice scheduled for trial on the merits. It is also significant that Regina at no time offered to return to the home. Her position, at best, has consistently been that she will not and can not return so long as Junior remained there. Kenneth's position has been just as consistent that he was not willing to remove Junior from the family home. As already indicated, it is my opinion that the failure or refusal of Kenneth to remove his son did not, under the circumstances, constitute marital misconduct on his part.

"Under all the circumstances, I think that Kenneth's conduct after the separation amounted to mere acquiescence in circumstances he could not prevent, which is not sufficient to establish a voluntary agreement to separate."

Judge Melvin dismissed Regina's bill of complaint and granted a divorce a mensa to Kenneth. He awarded the custody of Richard to Kenneth and gave Regina liberal visitation rights. In this appeal Regina contends Kenneth was guilty of constructive desertion, that she was not guilty of desertion, that she was not guilty of desertion because Kenneth consented to the separation and to its continuance, that custody should have been awarded to her and that Junior's conduct and Kenneth's refusal to put him out were properly in issue at the trial. While we see no merit in any of these contentions the question of custody seems to call for some comment.

Judge Melvin appears to have given this careful and thorough consideration. We quote from his oral opinion at the conclusion of the evidence:

"As you know I have talked to young Ricky, and I might say that he is probably the most sensible person I have talked to in this whole case. I think that both Mr. and Mrs. Franklin should be very proud of him. He impressed me as being a fine young man with intelligence, and, I think, an awareness of what the situation really is. He expressed no bitterness or displeasure or lack of affection for either parent. In fact, I am convinced in my own mind that he has a great deal of love and affection for both of them. He doesn't want to go to one place to the exclusion of the other. * * * [H]e did express the opinion that he would like to live with both parents, and of course that's a completely natural reaction for a normal, healthy twelve year old boy to have. He knows that he can't live with both of the parents all the time under the present circumstances, unless the parties do become bona fide reconciled, and [he] expressed the opinion that he would prefer to spend most of the time at his father's home, and I am not really sure that he used the word most of the time. I think what he meant by that was that he would like to be able to call that his home; that's where his friends are, most of his friends, and that's what he considers to be his home, again a natural reaction and a natural opinion for him to have. Under all the circumstances I feel in view of the fact that the child involved is a boy, twelve years old, growing up into all the problems involved with being a teenager, and taking into consideration as I think I should in a situation like that, his own feelings, since he appears to me to be a young man of some discernment, it would appear to me that the father

should have the legal custody of the child but with liberal visitation rights on the part of Mrs. Franklin."

Indeed we think Regina has little to complain about in this regard. The decree gives her the right to have Richard every other weekend, two weeks during the summer, Christmas and Thanksgiving every other year and at "such other or different times as * * * [they] may mutually agree upon." Moreover, if she elects to live near the home in Deale there is little doubt that she will see Richard pretty much at will.

One of the odd things about the case is the fact that Junior told Regina before she left that he was about to get married and that he would thereafter live elsewhere with his wife. And, as Judge Melvin pointed out, "there's very little, if any testimony, concerning any real difficulties that took place during that month. [One of] the two big fights that have been mentioned took place almost two years ago, and the other one, as I recall, was testified to as having taken place in January [1968], I believe." Of course Junior, his wife and their infant child came back to the home in the fall but as he said it was only temporary and that he was "getting away from there in the spring." If, as Regina insists, Junior was the cause of their troubles, then with his exodus accomplished she and Kenneth may yet settle their differences. After all they are still husband and wife.

While we agree with Judge Melvin's findings of fact, we could not disturb them even if we did not agree, since they are not clearly erroneous. Maryland Rule 886 a. The applicable principles of law are too well settled to require discussion.

*Affirmed.*
*Costs to be paid by appellee.*